1

2

3

4          UNITED STATES DISTRICT COURT

5         NORTHERN DISTRICT OF CALIFORNIA

6

7   ABDULATAEF ALI,                          Case No.  20-cv-08122-HSG

8                  Plaintiff,                **FINDINGS OF FACTS AND**
                                             **CONCLUSIONS OF LAW**
9          v.
                                             Re: Dkt. Nos. 130, 122
10  PASHA HAWAII HOLDINGS, LLC,

11                 Defendant.

12

13          Plaintiff Abdulataef Ali ("Plaintiff") alleges that he fell and was injured while working

14  aboard the M/V MARJORIE C as an employee of Defendant Pasha Hawaii Holdings, LLC

15  ("Defendant").  *See* Dkt. No. 1 ("Compl.") ¶¶ 3-4.  Plaintiff sued Defendant under the Jones Act,

16  46 U.S.C. § 30104, for negligence "and under the general maritime law for unseaworthiness,

17  maintenance, and cure."  *Id.* ¶ 2.  Plaintiff seeks damages for, among other things: pain and

18  suffering; loss of earnings and earning capacity; hospital, pharmaceutical and other cure expenses;

19  mental anguish; and maintenance, cure, punitive damages, and attorney fees.  *See id.* ¶ 5.

20          The matter was tried to the Court, sitting without a jury, from December 12, 2022 to

21  December 14, 2022, and on January 9, 2023.  On April 10, 2023, the parties filed proposed

22  findings of fact and conclusions of law.  *See* Dkt. Nos. 136, 137.  The Court heard closing

23  arguments on May 12, 2023.  The Court has carefully considered the evidence presented at trial,

24  the exhibits admitted into evidence, the parties' proposed findings of fact and conclusions of law,

25  and the arguments of counsel.  The following constitutes the Court's Findings of Fact and

26  Conclusions of Law.  *See* Fed. R. Civ. P. 52(a).[1]

27  _____

28  [1] Also pending before the Court are objections to deposition testimony designations, a request for
    judicial notice, a motion to strike and for sanctions, and an oral motion for a directed verdict.

United States District Court
Northern District of California

## I.   FINDINGS OF FACT

### A.   The Plaintiff

1.      Plaintiff Abdulataef Ali was a Jones Act seaman employed as an able-bodied seaman ("AB") aboard the M/V MARJORIE C at the time of his accident and injury.  Dkt. No. 71, Joint Pretrial Statement, at 4, section C ("Undisputed Facts") ¶¶ 1-3, 6-7; Trial Transcript ("TT") 223:3-10.[2]

2.      Plaintiff joined the Seafarers International Union ("SIU") on March 27, 2001, and remains a current member.  TT 19:4-8; Trial Exhibit ("TE") 005, SIU Seafarers ID; TE 007, Coast Guard Merchant Mariner Credential.  Whenever Plaintiff shipped aboard an SIU contracted vessel, including the M/V MARJORIE C, all terms, conditions, compensation, and benefits of employment were described and governed by a SIU Collective Bargaining Agreement (CBA) called the 2017 Standard Freightship Agreement between the Seafarers International Union and Contracted Companies, July 1, 2017 - June 30, 2022.  TT 19:17-21:2, 599:4-12; TE 006, SIU Standard Freightship Agreement.  Plaintiff worked as a professional mariner since he joined the SIU in 2001, and as an AB for more than 10 years.  Undisputed Facts ¶ 4; TT 27:4-8, 225:23-226:3.

3.      During the 19 years between the time he first started working as a seaman and his accident, Plaintiff worked for many shipping companies, including Defendant.  *See* TE 015, Certificates of Discharge.  Plaintiff testified that these companies provided him with an initial orientation when he joined a ship and held regular safety meetings.  TT 226:7-227:13.  At these safety meetings, crew members including ABs could raise any safety concerns they had.  *Id*. 227:11-13.  This included the safety meetings held by Defendant aboard the M/V MARJORIE C.  *Id*. 227:20-228:1.

4.      When Plaintiff boarded the M/V MARJORIE C on October 22, 2019, TE 015 at 60, he was required to possess a current and valid United States Coast Guard Merchant Mariner Credential and a current and valid United States Coast Guard Medical Certificate, proof that he had been

---

These are addressed at the end of these findings.
[2] The trial transcripts for the proceedings held from December 12, 2022 to December 14, 2022 and on January 9, 2023 are accessible on ECF in four sequentially paginated volumes at Dkt. Nos. 118 (pp. 1-282), 119 (pp. 283-453), 120 (pp. 454-608), 125 (pp. 609-727).

United States District Court
Northern District of California

subject to and passed a medical examination certifying him as fit for duty.  TT 27:16-28:8, 29:25-30:11; TE 007; TE 008, United States Coast Guard Medical Certificate.  He was also required to complete and sign a "Seaman's Statement of Physical Condition" attesting that he had a valid "SIU Clinic Card" and "FFD Slip" (Fit For Duty slip).  TT 51:7-52:5; TE 025, Seaman's Statement of Physical Condition Form.

### B.    The Defendant

5.      Defendant Pasha Hawaii Holdings is the operator of the M/V MARJORIE C and was Plaintiff's employer.  Undisputed Facts ¶¶ 2, 5.

### C.    The M/V MARJORIE C and its Pilot Ladders

6.      The M/V MARJORIE C has pilot stations located above the water line on both the port and starboard sides.  TT 63:3-65:6; TE 075 at 2, Inspection Images, Excerpts.  This is where ship pilots join or depart the ship as the vessel enters or leaves ports.  *Id*.; TE 040, Image of Scene or Equipment; TE 075 at 2-4.  The pilot stations have pilot ladders that are stored on pneumatically powered reels and lowered or raised with the use of an air motor.  Dkt. No. 105-8 ("Holmquist Depo.") 24:1-5, 63:3-15, 65:25-66:24.[3]

7.      The pilot ladder storage reels aboard the M/V MARJORIE C are powered by pneumatic or air motors designed and manufactured by the Gast Manufacturing Co.  Holmquist Depo. 24:23-25:3; TT 362:22-363:2.  Gast published an Operation & Maintenance Manual regarding the installation, operation, and maintenance of the Gast air motors installed aboard the M/V MARJORIE C to power the pilot ladder winches.  TE 026, Gast Air Motor Manual.  The manual states: "Warning: PLEASE READ THIS MANUAL COMPLETELY BEFORE INSTALLING AND USING THIS MOTOR. SAVE THIS MANUAL FOR FUTURE REFERENCE AND KEEP IN THE VICINITY OF THE MOTOR."  *Id*. at 3.  The section entitled "Mounting" states "This product can be installed in any orientation."  *Id*. at 5.  The section entitled "Connection" contains a diagram, followed by several paragraphs of text that include the following description: "[a]n

---

[3] Defendant objected to the admission of Mr. Holmquist's deposition testimony under Fed. R. Civ. P. 32 and Fed. R. Evid. 802.  *See* Dkt. No. 104 at 3.  The Court overrules this objection, finding based on the evidentiary foundation laid at trial that the identified portions of his deposition testimony are admissible.

United States District Court
Northern District of California

automatic air line lubricator should be installed in the air line as close as possible and no more than 18 inches (1/2 meter) from the air motor.  Install the lubricator level with or above air motor so that the oil mist will blow directly into or fall down into the motor." *Id*. at 5.

8.      The Gast air motors are designed to be automatically lubricated by an auto lubricator.  TT 380:15-20.

9.      As installed, the lubricator was mounted below the air motor in a vertical orientation, as depicted below.  TE 040; *see also* TE 041, Image of Scene or Equipment; TT 364:14-369:6, 371:25-372:25, 578:2-579:4.  Given the relative positioning of the lubricator below the air motor, any residual oil mist from the lubricator would not "blow directly into or fall down into the motor" after the air shut off.  TT 579:5-580:3.  Instead, when the air pressure was off, residual oil would flow back down into the box, and then would be pushed back into the air motor once the air was turned back on.  *Id*. 372:14-18.  Lines exceeding 18 inches in length connected the lubricator with the air motor.  *Id*. 374:2-13.



TE 040.

10.     According to Mats Holmquist, Defendant's technical superintendent, there had not been any problems on the M/V MARJORIE C with the location of the lubricator in terms of affecting performance.  TT 266:12-15, 357:1-3.  The M/V MARJORIE C's compressed air system, including the configuration of the pilot ladder air motor system, was designed by a naval architect. *Id*. 545:11-16.  Those designs were reviewed and approved by a classification society called Det

United States District Court
Northern District of California

Norske Veritas (DNV) on behalf of the U.S. Coast Guard.  *Id*. 270:13-272:6, 548:21-549:1; TE 230, Means of Access Drawing.  Specifically, the designs of the pilot stations and the compressed air system were approved by DNV on behalf of the Coast Guard, including the specific location of the air motor and other components in that system.  TE 230.  The plans show the control box (labeled "Air Prep Unit") located below the air motor, though they do not show further details like the location or orientation of the hoses.  *Id*. at 3.  Captain Gregory Johnson, Defendant's fleet superintendent, testified that it is common knowledge in the industry that an "air preparation unit" is an air dryer and a lubricator.  TT 575:13-576:2.  Captain Johnson further testified that the pilot ladder air motor system on the M/V MARJORIE C was installed at the shipyard, and not by Defendant.  *Id*. 577:16-23.

11.     Defendant maintained a computerized maintenance system aboard the M/V MARJORIE C called the Nautical Systems Enterprise.  TT 350:24-352:1.  This system generated work orders for routine inspection/maintenance work and documented the completion of that work.  *Id*.; TE 027, Work Order Service Requisition Forms.  One of those routine tasks was the monthly inspection and maintenance of the port and starboard pilot ladders.  TT 354:9-355:1, 229:3-6; *see, e.g.*, TE 027 at 2, Work Order Service Requisition Forms.  During this monthly task, the pilot ladder and related equipment were visually inspected and operated.  TT 355:2-5.  In addition, the hoses to the air motor were removed and air tool oil was added to the motor.  *Id*. 355:21-356:24, 385:25-386:11.  This required a seaman to use a step ladder to access the air motor, to loosen two hose clamps with a screwdriver, and to manually pull the hoses off the air motor hose barbs.  *Id*. 397:17-398:4, 238:19-239:12, 241:8-242:4.  In addition, the seaman had to grease the pilot ladder fittings, which also required a step ladder.  *Id*. 250:6-14.

12.     Plaintiff had completed the monthly pilot ladder inspection/maintenance several times before his accident.  According to Plaintiff, the bosun, Mr. Anthony ("Tony") Sabatini, had personally shown him how to perform this monthly pilot ladder maintenance.  TT 159:25-160:16.  After being shown how to do the job, Plaintiff did the job more than 10 times prior to his accident.  *Id*. 228:24-230:4.  As a result, he was familiar with the job and what was required to complete it.  *Id*. 230:5-6.  This included the use of a step ladder to access the air motor and hoses and to grease

United States District Court
Northern District of California

the pilot ladder fittings.  *Id.* 232:4-7, 236:9-24, 250:6-14.

13.     Plaintiff testified that he knew that the starboard pilot station hoses were stiffer and more difficult to remove than those on the port side.  He complained about this to the bosun, Mr. Sabatini, TT 161:10-162:24, 171:17-20, 176:4-12; 259:1-20, and Mr. Sabatini confirmed they were stiffer, Dkt. No. 105-4 ("Sabatini Depo.") 54:25-55:9.

14.     A common fitting called a "quick connector" is designed to easily and quickly connect and disconnect air hoses.  TT 392:4-11.  Quick connector fittings are fitted and utilized throughout the air systems aboard the M/V MARJORIE C, but were not used to connect the hoses to the pilot ladder air motors.  TT 392:12-15.  It would have been practically and technically feasible to install quick disconnect fittings to the automatic air line hoses and air motor of the starboard and port pilot ladder reels aboard the M/V MARJORIE C to allow them to be easily and quickly connected and disconnected.  TT 392:16-22.

15.     Though Plaintiff testified to not knowing the term "stop work authority," he testified that he understood that if he thought somebody assigned him a job that was not safe, he could stop working.  TT 228:2-9.  Plaintiff also testified that he understood that if he thought he needed help to do a job safely, he could ask for that aboard the M/V MARJORIE C.  TT 228:10-13.

16.     Plaintiff acknowledged that before he fell, he thought it was safe to do the job despite the stiffer hoses on the starboard pilot ladder.  *Id.* 263:2-4.

17.     Bosun Sabatini testified that from his own experience doing the job, it was "slightly" more difficult to remove the starboard pilot station's hoses.  Sabatini Depo. 54:25-55:9.  He also testified that he never personally had any issues performing the task on a stepladder.  *Id.* 38:5-12.

### D.     The Accident

18.     On December 8, 2019, while serving as an AB on the M/V MARJORIE C, Plaintiff and another AB, Bernadino Eda, were assigned the monthly pilot ladder inspection/maintenance task by the bosun.  TT 172:10-173:11; Undisputed Facts ¶¶ 7-11.

19.     Plaintiff testified that he and Mr. Eda selected a six-foot step ladder and gathered the tools, grease and air tool oil needed to do the job.  TT 232:4-234:4.  He further testified that he looked at the ladder before using it and it was not broken.  *Id.* 235:2-23, 248:8-249:3.  He then used it

United States District Court
Northern District of California

1   without incident to complete the port side pilot ladder inspection/maintenance.  After completing

2   the job on the port side, Plaintiff and Mr. Eda proceeded to the starboard side pilot station.  *Id.*

3   236:1-8.

4   20.     Once at the starboard pilot station, Plaintiff set up the ladder so it was next to the access

5   ladder attached to the bulkhead of the ship and facing the air motor.  This put the fixed access

6   ladder to Plaintiff's immediate right (aft), Plaintiff's back to the interior bulkhead (toward

7   midship) and Plaintiff facing toward the ocean on the starboard side of the ship.  TT 169:18-

8   170:17, 236:9-237:2; TE 075.  Plaintiff then climbed the step ladder while Mr. Eda held it steady.

9   TT 237:3-5.

10   21.     Plaintiff testified that he climbed up 4 or 5 rungs to get access to the air motor and hoses.

11   TT 237:6-7.  Mr. Eda reported on the day of the accident and subsequently testified in deposition

12   that Plaintiff was on the third rung of the ladder when he fell.  TE 038, Statement of Person

13   Claiming to Have Witnessed—Bernadino Eda; Dkt. No. 105-3 ("Eda Depo.") 32:23-33:18.  Based

14   on a review of photographs showing people standing on a six-foot ladder in the starboard pilot

15   station and based on the expert testimony of both Plaintiff's expert Steve Wiker and Defendant's

16   expert Eric Deyerl, the Court concludes that Plaintiff was most likely on the third rung up from the

17   bottom and not on the fourth or fifth rung up given the lack of overhead clearance in the area.  TE

18   232 at 80; TT 478:9-17, 648:8-650:13.

19   22.     After loosening the hose clamps on one or both hoses, Plaintiff attempted to pull a hose off

20   the air motor hose barb with one hand while he held onto the air motor itself with his other hand.

21   TT 241:25-242:22, 238:20-239:15.  Plaintiff testified that he was "struggling with the hose"

22   because it was jammed.  *Id.* 238:6-8, 177:21-22.  Plaintiff testified that as he was doing this, he

23   "lost balance, slipped and fell down."  *Id.* 177:17-22.  He landed on the deck on his right foot,

24   twisting his right knee.  *Id.* 177:23-178:12, 238:6-8; TE 037, Statement of Person Claiming Injury;

25   TE 038.  He then climbed back up the step ladder, finished the job, and then climbed out of the

26   pilot ladder station using the fixed vertical access ladder.  Eda Depo. 33:19-34:16, 34:21-35:13.

27   23.     Mr. Eda, who was steadying the stepladder, testified that he saw Plaintiff "a little bit

28   struggling to pull [the hose] off," but that the hose "came off right away."  Eda Depo. 24:9-25:14,

United States District Court
Northern District of California

30:4-7.  Mr. Eda recalled that Plaintiff had one hand on the pilot ladder station access ladder to steady himself.  *Id*. 25:2-14.  Mr. Eda testified that "then apparently [Plaintiff] slipped off all the way down to the deck, and I think on his knee or something, he rubbed the rung of the stepladder," and Plaintiff ended up standing on the deck.  *Id*. 29:4-6, 29:15-24.

24.     Plaintiff testified that none of the equipment or tools being used or worked on by Plaintiff broke or failed.  TT 243:5-23.  Specifically, he testified that the ladder did not break, collapse, or fall over.  *Id*.  Plaintiff also testified that the air motor, hoses, screwdriver and hose clamps did not break or fail.  *Id*.

25.     The day of the accident, Plaintiff submitted a Statement of Person Claiming Injury.  TE 037.  In the blank next to "I was doing the following," Plaintiff wrote "I was doing monthly maintenance at the stbd pilot ladder, trying to pull the hose while on the ladder I [lost] balance and fell from the ladder hurt my knee."  *Id*.  In the blank next to "This is the way that I say it happened," Plaintiff wrote "slip from the ladder, while trying to pull the hose out."  *Id*.  And in the blank next to "I blame or do not blame the following person(s), condition(s) or equipment for my accident," Plaintiff wrote "Do not blame."  *Id*.

26.     A few days after the accident, Mr. Eda submitted a Statement of Person Claiming to Have Witnessed or Was Nearby the Scene of a Reported Accident, Incident or Injury.  TE 038.  In the blank next to "What did you observe at that time," Mr. Eda wrote "The hose on stbd pilot ladder much harder to remove than port side. Stbd side requires both hands and ladder and port side does not."  *Id*.  After checking the "yes" box next to "Did you see the incident take place?," Mr. Eda wrote the following in the blank next to "state in detail what you saw":  "AB Ali lost his footing/balance on the third rung of the ladder causing him to slip to the deck below touching each rung on the way down."  *Id.*

27.     Job Safety Analysis (JSA), Job Hazard Analysis (JHA), and Risk Assessments are used to review jobs to identify risks and safety issues involved in a particular job procedure.  TT 377:24-378:6; Sabatini Depo. 26:24-27:8; Holmquist Depo. 57:4-18, 71:6-10.

28.     Plaintiff testified that Mr. Sabatini did not conduct a JSA meeting with him regarding how to complete of the procedure at issue with stiffer air hoses.  TT 172:6-9.

United States District Court
Northern District of California

29.     Mr. Holmquist was not aware of any JSA being conducted regarding the task Plaintiff was performing at the time of the accident.  TT 377:24-378:10.  Mr. Holmquist said he probably would have authorized the procedure if he had known about it, and would have conducted a risk assessment given that "there is always a risk of a fall with a ladder."  TT 401:21-402:11.

30.     Captain Johnson, whose duties include being the company's safety officer, did not believe that a risk assessment was required for the "very simple job" Plaintiff was performing at the time of the accident.  TT 536:19-537:5, 573:5-9.

31.     Resolving a factual conflict between Plaintiff's expert Dr. Wiker and Defendant's expert Mr. Deyerl, the Court finds Mr. Deyerl's testimony credible and persuasive, and finds that the job Plaintiff was performing (climbing three rungs up a stepladder being stabilized by a colleague, removing two hoses, inserting air tool oil, and replacing the hoses) was not unsafe, whether the ladder was facing toward the bulkhead (as both experts assumed) or toward the air motor (as Plaintiff testified for the first time at trial).  Mr. Deyerl testified, based on a demonstration he conducted himself (a video recording of which was used as a demonstrative exhibit at trial), that removing the hoses required about ten pounds of vertical pull force to remove, or about the amount of force needed to lift a gallon and a half gasoline can.  TT 484:1-485:11.  Mr. Deyerl determined this force estimate by using a force gauge immediately after performing the task.  *Id*. 484:16-21.  The condition of each hose, which "took some work to get it off and it was relatively stiff," *id*. 506:12-13, was consistent with Mr. Deyerl's understanding of Plaintiff's description of the hoses, though he did not know whether the hoses he handled were the same ones Plaintiff handled on the day of the accident.  *Id*. 506:2-14, 513:20-514:1 ("It seems to have characteristics similar to what's been described, but I can't say it's the exact same hose. . . .  It's the same type of hose").  The task did not require overreach (i.e., a person performing the task would not have to reach too far to either side of the ladder such that his center of gravity was outside the side rails of the ladder).  TT 485:12-486:7.  The task also did not involve much lateral force (i.e. "side-to-side wiggling"), estimated to be two to three pounds, and the greater amount of upward vertical force tends to stabilize a ladder by forcing the person's feet down onto the rung where he is standing.  *Id*. 484:22-485:1, 493:4-21.  Because each hose is under pressure when the air motor system is

9

1   being used, some minimum clamping force was required to hold the hose on.  *Id.* 508:9-18.  Mr.

2   Deyerl's ultimate opinion was that the task was safe, and he said it would not change his overall

3   opinions if the ladder was facing the air motor as Plaintiff testified at trial.  *Id.* 486:8-487:10,

4   511:15-512:5.  The Court finds these opinions persuasive and credits them, notwithstanding two

5   witnesses' subjective characterization of the hose removal task as involving Plaintiff "struggling"

6   to pull it off.  *Id.* 504:1-17; Eda Depo. 24:18-20.

7   32.     The Court finds Dr. Wiker's contrary opinions unpersuasive for at least the following

8   reasons.  First, Dr. Wiker's expert report did not directly disclose the opinion that was one of the

9   central aspects of his trial testimony: namely, that the orientation of the lubricator below the air

10  motor precipitated the series of events resulting in the accident.  *Compare* TT 644:12-15 ("And as

11  you can see, the motor is well below where the height of the air motor is.  So they didn't comply

12  with two major constraints that the manufacturer imposes for the operation of the motor.") *with*

13  TT 695:6-20 (Dr. Wiker responding "I don't know.  I don't remember" when asked whether his

14  report criticized the location of the air motor versus the lubricator, and indicating "I'm just saying

15  that I do remember criticizing the length of the air hoses"); TT 710:3-711:9 (when directed to

16  pages of Dr. Wiker's expert report (marked for identification as Exhibit 76) referenced by

17  Plaintiff's counsel on redirect, responding to the question "Can you find a single passage in any of

18  those pages in which you criticize the location of the lubricant reservoir vis-à-vis the air motor

19  itself?" by saying "I referred to it indirectly," and acknowledging "Well, I haven't read the whole

20  report, but I don't think I directly addressed those issues.  I just said had you followed the

21  manufacturer's installation requirements, we wouldn't have to use a ladder or pour oil into the

22  motor.").  The Court finds that Dr. Wiker's credibility was damaged by this mismatch between the

23  direct trial testimony and the oblique, "indirect" references in the report, which suggests that the

24  initial report was intended to keep options open for revising the key emphasis at trial.  Further, Dr.

25  Wiker acknowledged that he did not do any further research to determine why the ultimate

26  orientation of the control box and the pilot ladder reel reflected in the approved naval architectural

27  drawing was different than what was described in the manual.  TT 678:22-683:12.

28  33.     Similarly, Dr. Wiker's report contained theories of negligence that he either rescinded or

United States District Court
Northern District of California

1    characterized as irrelevant in his testimony, again suggesting that his opinions were formulated

2    initially to cast a wide net to maintain flexibility for later, and were then unduly subject to revision

3    at trial.  *See, e.g.*, TT 642:11-25 (rescinding criticism that "if [Defendant] didn't use the proper

4    sealant on the hose connections to the motor, that could increase the friction"), 647:23-648:1 ("I'm

5    retracting the comment about the sealant" because "I looked in here, and I couldn't see any sealant

6    buried underneath the – the barbs, and I didn't see any in the hose"), 694:24-695:5 (Dr. Wiker

7    testified that opinion in report that "based on personal observation" Defendant "may have elected

8    to use hose sealants that were not in compliance with those recommended by the manufacturer"

9    "should not be considered"), 689:23-25 (responding to question "your caption that says that these

10    are rags shown that were used to soak up leaking lubrication is wrong?" with "Yes.  I agree."),

11    692:11-21 (asserting that the "rags" issue "doesn't have anything to do with the accident," but was

12    included in the report because "it's a preliminary report"), 699:3-16 (responding to cross-

13    examination about whether deck fittings criticized in Dr. Wiker's report were required by

14    international law by saying "it's not relevant to the case," because "the only point I'm bringing up

15    is the pad eyes present a trip or a lower extremity injury hazard, and they could have achieved the

16    same function" with a different design).

17    34.      Finally, while Dr. Wiker acknowledged that whether to perform a JSA is "left to

18    professional judgment" and "doesn't have any criteria that says when you can do it or not do it,"

19    TT 635:17-636:10, his ultimate opinion was that "what [Defendant] should have done is just

20    brought in a consultant to look at [the equipment setup]," because Defendant's employees did not

21    "have the knowledge and analytical skill sets needed to perform a competent JSA or JHA."  *Id.*

22    672:11-21.  Dr. Wiker testified that "what the JSA would do[] is determine what the range of

23    dynamic coefficient of frictions are and what the limits on hand forces would be."  *Id.* 666:9-11.

24    The Court finds Dr. Wiker's opinions about the type of risk assessment that was required

25    unpersuasive and overreaching, given the nature of the task.  *See id.* 716:22-717:2 (testimony by

26    Captain Johnson answering "no" to question "Does the person [within Pasha] who has performed

27    those analyses hold the credentials that were opined by Dr. Wiker as required in order to perform a

28    job hazard analysis or risk analysis?"), 718:1-13 (testimony by Captain Johnson that in more than

United States District Court
Northern District of California

40 years he has never seen an outside expert brought in to perform a JHA or risk assessment for "minor tasks or routine maintenance").

### E.    Nature and Extent of Injury

35.    Plaintiff reported that he injured his right knee as a result of his fall off the ladder. Undisputed Facts ¶ 12.  When the ship arrived in Honolulu, Hawaii, Plaintiff was sent ashore for medical examination/treatment and was deemed not fit to return to duty.  *Id*. ¶ 13.  He was then flown home to Michigan for follow up medical examination and treatment.  *Id*. ¶ 14.

36.    Plaintiff was eventually seen by Dr. Jeffrey Waldrop, an orthopedic surgeon in Dearborn, Michigan who diagnosed him with a right knee, medial meniscal tear.  Dkt. No. 105-6 ("Waldrop Depo.") 20:17-22, 21:25-22:1.  On February 13, 2020, Dr. Waldrop performed a right knee arthroscopy.  *Id*. 21:1-8.

37.    Dr. Waldrop testified by deposition that during his surgery on Plaintiff's right knee, he found no sign of arthritis and that, with the exception of the meniscus tear, the knee was "pristine."  Waldrop Depo. 24:11-25:7, 46:21-49:2.  As a result, he expected a full recovery and that Plaintiff could return to his full activities without any restrictions.  *Id*. 24:11-25:7, 46:21-49:2. Dr. Waldrop testified that when he saw Plaintiff in April 2020, his recollection was that he "would basically recommend working like a graduated work-hardening program," which is a "more specific physical therapy program that is planned or shaped around the person's job occupation." *Id*. 33:11-34:4.

38.    Rather than continue to treat with Dr. Waldrop or pursue a course of work hardening, Plaintiff saw Dr. Ramsey Hammoud in Dearborn, Michigan in May of 2020.  Dkt. No. 105-5 ("Hammoud Depo.") 8:6-8.  As of the date of his deposition, Dr. Hammoud opined that the basis of Plaintiff's right knee pain was arthritis: loss of cartilage.  *Id*. 54:11-23.

39.    Plaintiff called expert Diana Bubanja to testify at trial.  Ms. Bubanja was retained to conduct a Functional Capacity Examination ("FCE") of Plaintiff and to prepare a life care plan identifying his future medical needs and costs.  TT 76:10-13, 113:21-114:9.  Ms. Bubanja has a Bachelor's Degree in Kinesiology and Physical Education and a doctorate in physical therapy.  TE 080, Curriculum Vitae of Diana Bubanja; TT 74:19-75:15.  She is not a medical doctor or an

orthopedist. *Id*. 130:12-17. Ms. Bubanja conducted a FCE of Plaintiff on September 7, 2021. *Id*. 130:18-21. She testified that, based on her FCE, Plaintiff is not able to return to work as a seaman and is only capable of doing sedentary work given his physical limitations. *Id*. 134:13-19. Ms. Bubanja also testified that she based her lifecare plan on a review of Plaintiff's medical records, conversations with Dr. Hammoud and Dr. Hammoud's deposition testimony. *Id*. 147:20-148:23, 150:2-151:13, 152:9-153:16.

40.     Dr. Piers Barry was retained by Defendant to conduct a medical examination of Plaintiff. Dr. Barry is a Board-Certified orthopedic surgeon. TT 286:17-287:23, 288:6-7. Dr. Barry testified that he performs between 300 and 600 orthopedic surgeries a year, most of which are knee surgeries. *Id*. 287:24-288:7. Dr. Barry conducted a medical examination of Plaintiff on January 17, 2022. *Id*. 301:2-4. Based on his physical examination, his review of the medical records and the deposition testimony of Dr. Waldrop and Dr. Hammoud, Dr. Barry opined that Plaintiff should have mostly recovered from his knee injury and February 2020 surgery by May 2020, with the ability to return to heavy labor within two to three months. *Id*. 288:24-289:6 (overview of some of the records considered by Dr. Barry for his expert report), 336:15-18 (explaining that he reviewed Dr. Hammoud's and Dr. Waldrop's deposition transcripts), 308:22-309:11. Dr. Barry testified that, contrary to Dr. Hammoud's deposition testimony, Plaintiff does not require any additional medical treatment, let alone future knee surgery, as of the date of his physical examination. *Id*. 311:7-312:14, 313:1-20. Dr. Barry could not find any orthopedic explanation for why Plaintiff continued to report knee pain. *Id*. 303:3-8. Dr. Barry persuasively explained why Ms. Bubanja's FCE and life care plan were not credible based on his review of the medical records and his examination of Plaintiff. *See e.g.*, *id*. 303:9-308:21, 309:18-311:6. In addition, Dr. Barry testified that, contrary to Ms. Bubanja's testimony, Plaintiff was and currently is capable of returning to work without restrictions. *Id*. 313:6-20.

## II.     CONCLUSIONS OF LAW

41.     Plaintiff brought causes of action for 1) negligence under the Jones Act, 2) unseaworthiness under general maritime law, and 3) maintenance and cure under general maritime law. *See* Compl. ¶ 2.

**F.    Jones Act Negligence Claim**

42.    To prevail on a Jones Act negligence claim, a seaman must establish the following elements by a preponderance of the evidence:

a.  the plaintiff was a seaman;

b.  the defendant was negligent; and

c.  the defendant's negligence was a cause of the injury or damage to the plaintiff.

Ninth Circuit Manual of Model Civil Jury Instructions ("Model Instruction") No. 7.2.  "The elements of a Jones Act negligence claim are: duty, breach, notice and causation."  *Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658, 662 (9th Cir. 1997).  "To recover under a Jones Act claim, the plaintiff has the burden of establishing by a preponderance of the evidence, negligence on the part of his employer . . . [and] that the act of negligence was a cause, however slight, of his injuries."  *In re Hechinger*, 890 F.2d 202, 208 (9th Cir. 1989) (internal quotations and citation omitted).

**i.    Duty**

43.    "The employer of a seaman owes the seaman a duty under the Jones Act to provide the seaman with a safe place to work."  *Ribitzki*, 111 F.3d 658 at 662.  Without dispute, as found above, Plaintiff was a Jones Act seaman at the time of the accident.  Plaintiff has satisfied the element of duty.

**ii.    Breach**

44.    "Negligence under the Jones Act is the failure to use reasonable care . . . . Negligence is the doing of something that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the circumstances."  Model Instruction No. 7.3.

45.    Here, based on the evidence introduced at trial, the Court concludes that Defendant was not negligent in requiring Plaintiff to do the maintenance job he was performing at the time of his accident.  Plaintiff testified that he complained to the bosun that it was more difficult to remove the air hoses on the starboard side pilot station, and said he "struggled" to remove the hoses.  The bosun, Mr. Sabatini, testified that he had done the same job.  He confirmed that the starboard side

14

hoses were stiffer and it was "slightly" more difficult as a result.  However, he did not testify that this made the job unsafe or dangerous.  Plaintiff was taught how to perform the job by the bosun and had performed the task more than 10 times before his accident.  Plaintiff was familiar with the task and the tools required to perform it, including the use of a step ladder to access the air motor, hoses, pilot ladder reel and gears.  There was no evidence presented of any prior accidents involving this routine task, nor was there testimony from any of the seamen or bosun who had performed this job that it was unusual or dangerous.  Plaintiff testified that he knew he could have stopped working on a job if he thought it was unsafe, but he did not do so here.  And the Court finds credible the testimony of Defendant's expert Mr. Deyerl that the task was not inherently dangerous so as to make it unreasonably imprudent for Defendant to ask him to complete it.

46.     Based upon the description of the job provided by the witnesses, the testimony of the parties' liability experts, and the demonstration of removing a hose from a similar air motor and barb at trial, the Court concludes that there was nothing inherently unusual or dangerous about the task.  The Court finds that it was not unreasonable or negligent for Defendant to ask Plaintiff, an experienced AB, to perform this task, particularly with the assistance of another experienced AB, Mr. Eda.

47.     The Court finds that Defendant was not negligent in installing or maintaining the Gast air motors and automatic air line lubricators for the pilot ladders in a different configuration than the one laid out in the diagram in the Gast Manufacturing Company manual.  First, the manual directly says that the equipment "can be installed in any orientation."  TE 026 at 5.  Even if this installation setup prevented sufficient lubrication from reaching the air motors, eventually resulting in Plaintiff needing to lubricate the motor, Plaintiff has failed to show that there was anything necessarily or inherently negligent in setting up the air motor and automatic air line lubricator in a different configuration than the one suggested by the manual.  The port side pilot ladder station had the same configuration, but never experienced problems.  TT 373:16-22.  The diagram approved by classification society Det Norske Veritas AS on behalf of the Coast Guard reflected this orientation.  *See* TE 230.  And Captain Johnson testified that Defendant did not install the equipment in the first instance, and that the installation happened at the shipyard.  TT

1   577:16-23.  Given that Plaintiff's theory of negligent design relied entirely on the face of the

2   manual (and Dr. Wiker's interpretation of it), the Court finds that he has not met his burden of

3   showing a breach of the duty of care in this regard, or with respect to Defendant's maintenance of

4   the air motor system.

5   48.     The Court finds Defendant was not negligent in using barbed fittings, instead of readily

6   available "quick connect" fittings, on the pilot ladder station air motors.  Defendant's use of

7   barbed fittings instead of quick connect fittings was not "something that a reasonably prudent

8   person would not do . . . under the circumstances."  Model Instruction No. 7.3.  Even if the quick

9   connect fittings could have made the lubrication maintenance job easier, it was not imprudent to

10  continue using barbed fittings.

11  49.     The Court finds that the officers and supervisors of Defendant and the M/V MARJORIE C

12  were not negligent for failing to replace the allegedly stiff hoses on the starboard pilot ladder air

13  motor.  Although replacing the stiff hoses could have made the lubrication maintenance job easier,

14  choosing not to replace them was not a "failure to do something that a reasonably prudent person

15  would do, under the circumstances."  Model Instruction No. 7.3.

16  50.     The Court finds that the officers and supervisors of Defendant and the M/V MARJORIE C

17  were not negligent for failing to conduct a JSA, JHA, or risk assessment of the assigned job

18  procedure.  Whether a JSA is conducted is left to the professional judgment of the supervisors.

19  This job had been performed by Plaintiff over 10 times before the accident without incident.

20  Although Plaintiff had complained to his bosun that the hoses on the starboard pilot station were

21  harder to remove that the port pilot station, this does not mean that a reasonably prudent person

22  necessarily would have conducted a JSA or risk assessment, especially when the job had been

23  performed so many times already without incident and the bosun had himself done the job and

24  found it only slightly more difficult to do on the starboard side than on the port side.  For the

25  reasons described above in the discussion of the expert testimony at paragraph 31, the Court finds

26  no breach of the duty of care in this regard.

27  51.     Because the Court concludes that Plaintiff has not shown by a preponderance of the

28  evidence that Defendant breached its duty of care, it does not reach the notice and causation

United States District Court
Northern District of California

elements.

### G.   Unseaworthiness

52.   To prove an unseaworthiness claim under general maritime law, a seaman must establish

the following elements by a preponderance of the evidence:

        a.   the plaintiff was a seaman;

        b.   the M/V MARJORIE C was unseaworthy; and

        c.   the unseaworthy condition was a cause of an injury or damage to the plaintiff.

Model Instruction No. 7.5.

53.   Defendant does not contest that Plaintiff was a seaman for the purposes of an

unseaworthiness claim.  The Court concludes that Plaintiff has satisfied this element.

54.   Unseaworthiness is defined as follows:

> A vessel is seaworthy if the vessel and all of it parts and equipment are reasonably fit for their intended purpose . . . . A vessel in unseaworthy if the vessel or any of its parts or equipment, is not reasonably fit for its intended purpose . . . . A vessel owner has a duty to provide adequate safety equipment for the vessel.  However, the owner of the vessel is not required to furnish an accident-free ship.  A vessel owner is not called on to have the best parts and equipment, or the finest crew, but is required to have what is reasonably proper and suitable for its intended use, and a crew that is reasonably competent and adequate.

*Id.* at 7.6.

55.   None of the equipment or tools being used or worked on by Plaintiff broke or failed.

Similarly, there was no evidence that Plaintiff was provided with inadequate assistance, that Mr.

Eda was not competent to assist in the job or that he failed to properly steady the ladder.  While

Plaintiff complained that the air hoses in the starboard pilot station were stiffer and more difficult

to remove, there was no evidence that the hoses were improper or not reasonably fit for their

intended purposes.

56.   The Court finds that the M/V MARJORIE C was not unseaworthy or unfit for its intended

purpose when it entered service because the Gast air motors and automatic air line lubricators for

the pilot ladders were installed and maintained in a different configuration than the one laid out in

the Gast Manufacturing Company manual.  Even assuming that this configuration did not result in

United States District Court
Northern District of California

the M/V MARJORIE C having the "best parts and equipment," it was still "reasonably proper and suitable for its intended use," Model Instruction 7.6, namely raising and lowering the pilot ladder. The Court also finds that the officers and supervisors of Defendant and the M/V MARJORIE C did not render the vessel unseaworthy by failing to properly utilize the Nautical Systems Enterprise to identify issues with the motor's installation.

57.     The Court finds that Defendant adequately and competently maintained the vessel's compressed air system.

58.     The Court finds that the use of barbed fittings, instead of readily available "quick connect" fittings on the pilot ladder station air motors did not render the M/V MARJORIE C unseaworthy. Even if the quick connect fittings would have made the lubrication maintenance job easier, the hoses and hose clamps in use at the time of Plaintiff's accident were "reasonably proper and suitable for [their] intended use." Model Instruction 7.6. The existence of newer, better, or easier-to-use equipment does not render the equipment in use at the time of the accident unseaworthy.

59.     Because the Court concludes that Plaintiff has not shown by a preponderance of the evidence that the M/V MARJORIE C was unseaworthy, it does not reach the causation element.

### H.     Maintenance and Cure

60.     To prevail on a maintenance and cure claim, "the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence":

>      a.   the plaintiff was a seaman;

>      b.   the plaintiff was injured or became ill while in the service of the vessel; and

>      c.   the amount of maintenance and cure to which the plaintiff was entitled.

Model Instruction No. 7.11.

61.     Under general maritime law, "a seaman who falls ill while in the service of his vessel is entitled to . . . maintenance and cure." *Dragich v. Strika*, 309 F.2d 161, 163 (9th Cir. 1962) (seaman who evidenced signs of Parkinson's disease aboard fishing vessel entitled to maintenance and cure). Cure is the cost of medical treatment. Model Instructions No. 7.11. Maintenance includes the "reasonable cost of food, lodging and transportation to and from a medical facility," with the rate of maintenance to include the cost of securing room and board on land. *Id.* Here, the

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1   maintenance rate was set by Plaintiff's Union in its CBA.  TE 006 at 18.

2   62.     The obligation of an employer to provide maintenance and cure does not depend on the

3   negligence or fault of the shipowner, nor is it limited to cases in which the seaman's employment

4   caused his illness.  *Id*.  Traditionally, courts have construed this obligation liberally.  *See, e.g.*,

5   *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 735 (1943) (obligation should "be not narrowly

6   confined or whittled down by restrictive and artificial distinctions defeating its broad and

7   beneficial purposes"); *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1044 (9th Cir. 1999).

8   63.     However, an employer is obligated to pay maintenance and cure only until the seaman

9   reaches "maximum cure."  Model Instruction No. 7.11.  This is sometimes also called "maximum

10  medical recovery," *Whitman v. Miles*, 387 F.3d 68, 72 (1st Cir. 2004), and is defined as the point

11  beyond which it is not reasonably expected that medical treatment will improve the seaman's

12  condition.  *See Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 530 (1938); *see also Vella v. Ford

13  Motor Co.*, 421 U.S. 1, 5 n.5 (1974), 1 Robert Force & Martin J. Norris, *The Law of Seamen* §

14  26:37 (5th ed.).  A vessel owner need not pay for medical treatment which will be "only

15  palliative" – meaning that it will only "ease without curing."  *Stanovich v. Jurlin,* 227 F.2d 245,

16  246 (9th Cir. 1955).

17  64.     Here, the Parties stipulated to the pretrial maintenance and cure payments made by

18  Defendant.  Dkt. No. 103.  This included $17,792 in maintenance benefits from December 10,

19  2019 through December 7, 2022, as well as $22,606.98 in cure and $290.68 in mileage for medical

20  visits as of December 6, 2022.  *Id*. ¶¶ 1-3. In addition to maintenance and cure, Defendant also

21  made payments to Plaintiff totaling $20,000 between January 2020 and August 2020.  *Id*. ¶ 4.  As

22  a result, the only issue is whether Plaintiff has reached maximum cure and, if so, when he did.

23  65.     Plaintiff did not call Dr. Hammoud live at trial.  Instead, he relied upon the deposition

24  testimony of Dr. Hammoud.  Similarly, Dr. Waldrop did not testify live, but only by deposition.

25  Plaintiff called Ms. Bubanja at trial, and Defendant called Dr. Barry at trial to address Plaintiff's

26  recovery, physical condition and ability to return to work.

27  66.     After reviewing and weighing the deposition testimony of Plaintiff's treating doctors, Dr.

28  Waldrop and Dr. Hammoud, and hearing the live testimony of Plaintiff's FCE expert Ms. Bubanja

and Defendant's orthopedic expert Dr. Barry, the Court concludes that Plaintiff reached maximum cure no later than January 17, 2022 when Dr. Barry examined him.  As a result, Plaintiff was not and is not entitled to recover maintenance and cure after that date and Defendant is not obligated to pay any additional maintenance and cure. [4]

## III.    OBJECTIONS TO DEPOSITION DESIGNATIONS

In the parties' Joint Pretrial Statement, the Plaintiff listed deposition excerpts counsel intended to introduce at trial.  *See* Dkt. No. 71 at 22-23.  Defendant in turn lodged objections to some of the deposition designations.  *See id*. at 23-26.  Defendant also provided a list of counter-designations.  *See id.* at 26-28.  Plaintiff represented that it had no objections to Defendant's counter-designations.  *See id*. at 28.  The Court directed Plaintiff to file any specific deposition transcripts he intended to introduce at trial, *see* Dkt. No. 101, and Plaintiff filed these excerpts as Dkt. No. 105.[5]  The parties also submitted additional expert deposition designations, Dkt. No. 102, and Defendant submitted objections to these new designations, Dkt. No. 104.  Plaintiff submitted a response to Defendant's cumulative objections.  Dkt. No. 142.

As indicated at footnote 3, the Court **OVERRULES** Defendant's objection to the introduction of Mr. Holmquist's deposition testimony.  Dkt. No. 104 at 3.  As for the remainder of Defendant's objections to Plaintiff's deposition designations of witnesses Anthony Sabatini, Captain Jamie Beadnell, Bernardino Eda, Ramsey Hammoud D.O., and Jeffrey Waldrop M.D., *see* Dkt. Nos. 71, 104, the Court **OVERRULES** them.[6]  The Court further **TERMINATES AS MOOT** Defendant's objections to Plaintiff's designations of Dr. Phillip Allman and Maria Brady's deposition testimony, as that testimony related only to the issue of damages, which the Court did not reach given its finding of no liability.

## IV.    REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE

Also pending before the Court is Defendant's Request for Judicial Notice and/or in the

---

[4] The Court denies Defendant's further request for the Court to order Plaintiff to reimburse Defendant the $20,000 in additional payments it made.

[5] Plaintiff also filed the corrected transcripts of Maria Brady, MS and Phillip Allman, Ph.D, Dkt. No. 109.

[6] Plaintiff did not lodge objections to Defendant's designations.

20

United States District Court
Northern District of California

1  Alternative to Admit Trial Exhibits 368 and 369.  Dkt. No. 122.  Plaintiff opposed Defendant's

2  request, Dkt. No. 126, and Defendant filed a reply, Dkt. No. 128.  In support of its reply,

3  Defendant submitted a declaration by Christopher Tribolet, Dkt. No. 128-1 ("Tribolet

4  Declaration").  Plaintiff filed a motion to strike the Tribolet Declaration and for sanctions.  Dkt.

5  No. 130.  Defendant filed a response. Dkt. No. 135.  It does not appear that Plaintiff filed a reply.

6       The Court **DENIES AS MOOT** Defendant's request for judicial notice of (and

7  alternatively to admit) Exhibits 368 and 369 because the information is not relevant to the issues

8  in the case and taking notice of this information would not have changed the outcome of the order.

9  Because the Court has denied as moot the request for judicial notice, it **DENIES AS MOOT**

10  Plaintiff's motion to strike the declaration submitted in support of the request for judicial notice.

11  Dkt. No. 130.  The Court also **DENIES** Plaintiff's request for sanctions.  *Id.*

12  **V.     MOTION FOR DIRECTED VERDICT**

13       Plaintiff made an oral motion for a directed verdict on December 14, 2022 and the Court

14  took the motion under submission.  TT 605:2-3.  The Court **DENIES** the motion for directed

15  verdict in light of these findings.

16  **VI.    CONCLUSION**

17       The Court **DENIES AS MOOT** Defendant's request for judicial notice, Dkt. No. 122, as

18  well as Plaintiff's motion to strike and for sanctions, Dkt. No. 130.  The Clerk is **DIRECTED** to

19  enter judgment in favor of Defendant and close the file.

20       **IT IS SO ORDERED.**

21  Dated:  1/18/2024

22

23  HAYWOOD S. GILLIAM, JR.
    United States District Judge